(No. 45679.—

WILLIAM H. LOWE *et al.*, Appellants, v. THE FIRST PRESBYTERIAN CHURCH OF FOREST PARK *et al.*, Appellees.

*Opinion filed January 31, 1974.—Modified on denial of rehearing March 28, 1974.*

GOLDENHERSH, J., dissenting.

John Mulder, of Chicago (Gardner, Carton, Douglas, Chilgren & Waud, of counsel), for appellants.

Richard D. Price and Frederick J. Bertram, both of Chicago, for appellees.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiffs, the Presbytery of Chicago of the United Presbyterian Church in the United States of America (hereafter the Presbytery and United Presbyterian Church, respectively) and its Committee on Business Affairs, Budget and Building Counsel, filed suit for a mandatory injunction against defendants, the First Presbyterian Church of Forest Park and six individuals as trustees of the church, seeking to compel the conveyance of that church's real and personal property to the Church Extension Board of the Presbytery. The Cook County circuit court denied defendants' motions for dismissal of the complaint and for summary judgment, and awarded plaintiffs judgment on the pleadings. The First District Appellate Court reversed (*Lowe v. First Presbyterian Church,* 9 Ill. App. 3d 415), and we allowed plaintiffs' petition for leave to appeal.

Plaintiffs allege that on October 8, 1968, the Presbytery adopted a resolution dissolving the congregation of the First Presbyterian Church of Forest Park as of October 31, 1968, and directed that the assets of the church be liquidated by the plaintiff committee. Defendant trustees subsequently refused to convey the real property or turn over the personal property of the church, and this suit followed.

The essence of this controversy is found in the allegations that the defendant church is a religious corporation (General Not For Profit Corporation Act, Ill. Rev. Stat. 1971, ch. 32, par. 163a *et seq.*) holding title to the real estate in controversy for the use and benefit of its congregation; and that the defendants constitute a member church of the Presbytery subject to its control and supervision. Plaintiffs assert that the defendant church is subordinate to the Presbytery and that under the provisions of chapter XXXII of the Form of Government of the United Presbyterian Church defendants are required to convey the property in accordance with the directions of the Presbytery. Chapter XXXII provides:

"Whenever hereafter a particular church is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of its members, the abandonment of its work, or other cause, such property as it may have, both real and personal, shall be held, used and applied for such uses, purposes, and trusts as the presbytery may direct, limit, and appoint, or such property may be sold or disposed of as the presbytery may direct, in conformity with the Constitution of the United Presbyterian Church in the United States of America." Section 62.11.

"Whether by civil law the trustees of a particular church hold title to its property or are the officers of a corporation which holds title thereto, they shall deal with such property only as they may be authorized or directed by the session, and their authority in respect to the selling, mortgaging, and leasing of real property shall be subject also to any rights reserved to the congregation by civil law or the bylaws of the particular church and to the permission of presbytery as herein provided." Section 62.08.

Plaintiffs further allege that the defendant church in all of its operations has always recognized and honored the authority of the Presbytery until directed by the Presbytery to transfer its property. Defendants, in their amended answer, state that the Church Extension Board had previously conveyed and quitclaimed the property in question to them, and that plaintiffs are without authority to order defendants to reconvey the property to the Church Extension Board. Defendants deny that their church was ever subject to the control or supervision of the Presbytery, and while they do not deny a resolution was adopted by the Presbytery dissolving the defendant church, they assert that the resolution was an assumption of authority not existing in the organization of the Presbytery. They also allege that subsequent to the incorporation of the defendant church as a religious corporation, it paid out over $30,000 in rebuilding, remodeling and renovating the church building and premises, and that this work was paid for with the proceeds of a mortgage loan of $25,000 and the remainder from the

defendant church's treasury. They also state that prior to incorporation the members provided all the funds needed for the maintenance and operation of the church building. Defendants further allege that the members of the defendant church unanimously desire to continue to hold regular church services.

Defendants' theory is that the conveyance by quitclaim deed to the defendant church was an outright transfer and, in the absence of an express declaration of trust, the property should not be subject to the control of the Presbytery. The appellate court agreed and reversed the judgment of the trial court, relying basically on *Calkins v. Cheney* (1879), 92 Ill. 463. *Calkins* involved a contract by a parish of the Protestant Episcopal Church to purchase a lot upon which to erect a church and parsonage. Money for the purchase and the project was obtained by donations from members of the parish and from rental or sale of pews in the proposed church building. The congregation intended to eliminate control of the property by the Bishop and retain sole control and management thereof. To that end it was arranged to convey the property to the "Trustees of Christ Church" with no express declaration of trust in the deed or any other document. Minority members of the congregation in *Calkins* filed suit to enjoin a rector deposed by the Protestant Episcopal Church from serving as rector in the Christ Church and to enjoin the congregation from compensating him, allowing him to officiate at services, or reside in the parsonage. In deciding the case the court looked to the deed conveying the property to the trustees of Christ Church. That deed contained no express declaration of trust for the Protestant Episcopal Church in general, nor was there a separate written declaration of trust by the trustees. The court also noted the clear efforts of the congregation and trustees to avoid interference by the Bishop. On these facts the court held that the property belonged outright to the congregation of Christ Church,

was not held in trust for the benefit of the parent church, and was not subject to the control of any ecclesiastical judicatory.

Defendants in this suit and the appellate court, in the absence of an express declaration of trust for the benefit of the Presbytery or general church, have relied on *Calkins*. It is not disputed that legal title to the property here is in the trustees of the church corporation by virtue of the quitclaim deed. Therefore, assert defendants, plaintiffs have no right to order transfer of the property, since, they urge, the property is subject only to control by the local church. Defendants also cite *Dubs v. Egli* (1897), 167 Ill. 514; *Illinois Classis of the Reformed Church v. Holben* (1919), 286 Ill. 473, and *Glader v. Schwinge* (1929), 336 Ill. 551, as either following *Calkins* or citing it with approval.

While this approach has surface appeal, we do not believe the holding in *Calkins* is dispositive here. Resolution of the issue here requires us to do more than simply examine the deed conveying the property. In doing so, however, it is necessary to recognize that the freedom of religion guaranteed by both Federal and State constitutions limits the scope of action by a civil court in the settlement of disputes over church property. Courts have, with varying degrees of success, sought, in resolving such controversies, to formulate principles which preserve and protect the legitimate interest of the State without undesirable or impermissible interference in the internal operation of those rules which churches have chosen as their own form of government.

The more recent view of the law relating to church property disputes attaches substantial significance to the internal structure or polity of the congregation and the parent church. (*Watson v. Jones,* 80 U.S. (13 Wall.) 679, 726-727, 20 L. Ed. 666, 676; *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 334 U.S. 94, 116, 97 L. Ed. 120, 136, 73 S. Ct.

143; *First Presbyterian Church v. First Cumberland Presbyterian Church,* 245 Ill. 74, 95.) A major factor in resolving questions of ownership and control of church property resulting from disputes between local and national church organizations is the structure of the parent church body and its relationship to the local church. *Watson; Kedroff; Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 21 L. Ed. 2d 658, 89 S. Ct. 601; *First Presbyterian Church v. First Cumberland Presbyterian Church.*

*Watson* is a century-old case which begins the modern view of the law on church property disputes. A Presbyterian congregation in Louisville, Kentucky, divided into two factions as the result of differing opinions regarding an oath stating opposition to slavery. Each faction claimed the local church building. The General Assembly of the Presbyterian Church decided that the majority, which favored the oath, was the legitimate successor to the congregation and entitled to use the property. The Supreme Court noted that the local congregation was a member of the national Presbyterian Church and subject to its control and system of ecclesiastical government. Therefore, since the General Assembly had decided the question, the court was bound by that decision. In classifying the questions concerning rights to property held by ecclesiastical bodies into three general categories, the court observed:

"1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support or spread of some specific form of religious doctrine or belief.

2. The second is when the property is held by a religious congregation which, by the nature of its

organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.

3. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization." 80 U.S. (13 Wall.) 679, 722-723, 20 L. Ed. 666, 674.

A note, Judicial Intervention in Disputes Over the Use of Church Property, 75 Harv. L. Rev. 1142, 1143 (1962), also discusses the type of church organizations, indicating the three basic forms of internal church structure to be congregational, presbyterial and episcopal. In the congregational form the local congregation is autonomous, while in the presbyterial and episcopal form the structure is hierarchical.

The *Watson* opinion dealt with the third category, where the congregation was a subordinate member of a superior general church organization. The court concluded that in this class of case, "whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666, 676.

In a more recent decision by the Supreme Court in a church property dispute, *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 21 L. Ed. 2d 658, 89 S. Ct. 601, the court prohibited a civil court from awarding church property on the basis of the interpretation and significance which the

civil court accorded various aspects of church doctrine. The Georgia courts had sustained a theory that implied a trust of local church property for the benefit of the general church so long as the general church adhered to the tenets of faith existing at the time of affiliation by the local churches. Whether the general church had departed from those tenets was determined by the Georgia courts. This approach allowed the civil court to determine ecclesiastical questions in the process of resolving property disputes, and was held to be in direct conflict with the holding of *Watson* which had been elevated to constitutional stature in *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church In North America,* 344 U.S. 94, 97 L. Ed. 120, 73 S. Ct. 143.

In *Kedroff* the court found unconstitutional a New York statute which approved the transfer of control of St. Nicholas Cathedral from the central governing authority of the Russian Orthodox Church to the independent Russian Church of America. The court there held that the right to use the cathedral and the right to appoint the ruling hierarch of the archdiocese of North America were matters of ecclesiastical government with which neither a secular statute nor a civil court could interfere.

It is apparent that resolution of the controversy here requires a detailed examination of the governmental structure of the United Presbyterian Church and its relationship to the First Presbyterian Church of Forest Park.

The United Presbyterian Church is one of two substantial Presbyterian church bodies in this country. (Annot., 52 A.L.R.3d 324, 418 n.20, citing G. Weigel, Churches in North America (Schocken Books 1965, p. 34).) There are other smaller Presbyterian church bodies, all of similar governmental structure. That structure consists of a series of ascending bodies called Judicatories. At the lowest level is the Session composed of trustees, deacons and other members of the local congregation. At

the secondary level is a Presbytery made up of many local Presbyterian churches such as the Presbytery of Chicago, one of the plaintiffs here. At the third level is a Synod comprised of a number of Presbyteries, and the supreme governing body is the General Assembly, the actions of which are controlling at all lower levels. Plaintiffs' allegation that this is the structure of the United Presbyterian Church is not contested, and the nature of the Presbyterian church governmental structure has been demonstrated in a series of cases collected in the annotation in 52 A.L.R.3d 324, at 417-423. It is clear that the United Presbyterian Church is hierarchical in governmental form in that each judicatory has control of those below it. The significance here of this structure is that each member Presbyterian church is subject to the rules and directions of its Presbytery, Synod and Assembly.

The remaining question is whether the First Presbyterian Church of Forest Park is a member of the general church and therefore a part of that hierarchical structure. Plaintiffs have alleged certain events in the history of the defendant church as evidencing its affiliation with, and subordination to, the Presbytery. In their answer to plaintiffs' motion for judgment on the pleadings, defendants do not deny that these specific events occurred, but rather, deny that their occurrence indicates jurisdiction and control in the Presbytery. A recital of those events is illuminating as to the nature of the relationship which has existed between the defendant church and the Presbytery and general church.

In accordance with chapter X, section 7 of the Form of Government of the United Presbyterian Church giving a Presbytery the power to form or receive new congregations, the Presbytery of Chicago in 1913 authorized the organization of the Pioneer Presbyterian Church of Forest Park. A pastor was approved by the Presbytery and installed pursuant to chapter XV, section 1 of the Form of Government. The name was later changed with the

approval and consent of the Presbytery to the First Presbyterian Church of Forest Park. The church was incorporated as a not-for-profit religious corporation in compliance with a mandatory requirement of the Form of Government (ch. XXVII, sec. 3) designed to facilitate the activities of the local churches in receiving, holding and transferring property. We believe that incorporation of the local church can hardly be viewed as releasing that church from general church control when such incorporation is required by the general church for the reasons above stated.

In 1958 the Church Extension Board of the Presbytery of Chicago conveyed the property in question to the defendant church by quitclaim deed for a stated consideration of one dollar. One year later the Presbytery authorized the defendant church to mortgage the property. The Presbytery specified that the proceeds from the mortgage be used for remodeling, and specified the amount, term and rate of interest. The Presbytery also approved the cost of the remodeling and required that $15,000 be secured in pledges before the program was commenced. This was done pursuant to chapter XXVII, section 10a of the Form of Government, which provides that a church "shall not sell or mortgage any of its real property without written permission of the Presbytery."

The defendant church has submitted its Session minutes for review by the Presbytery on an annual basis. The Presbytery has terminated the relationship of a pastor to the defendant church, approved the retirement of a pastor and appointed a moderator to serve while the church was without an active pastor. Similarly, the Presbytery approved purchase of an organ at a specified price by the local church. In short, it seems to us clear that since the original formation of the Pioneer Presbyterian Church some 60 years ago defendants have been an integral party of the United Presbyterian Church. Their membership implies consent to its form of government

(*Watson; Mary Elizabeth Blue Hull*), and their conduct during that period acknowledges its supremacy. Under that form of government, as earlier indicated, the Presbytery is authorized to direct the disposition of a local church's property upon dissolution of that church. There are no allegations in the pleadings before us which justify interference by a civil court. See *Gonzales v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 74 L. Ed. 131, 50 S. Ct. 5.

Our conclusion here is not new to Illinois church law. (*First Presbyterian Church v. First Cumberland Presbyterian Church,* 245 Ill. 74.) The cited case involved the effect on local church property of the reunion of two separate national organizations of the Presbyterian Church. Title to a local church building and parsonage was dependent upon the validity of the merger. The general assemblies of the two churches had already decided the question, a decision this court held binding upon it: "this court must follow the determination of that ecclesiastical court in the determination of the property rights here involved." (245 Ill. 74, 120.) In so deciding the court cited *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L. Ed. 666, and remarked:

> "*** where, as here, the religious corporation or other body holding title to church property is but a subordinate member of some general church organization in which there is a superior ecclesiastical tribunal, with general jurisdiction of review and control over the inferior tribunals of the church and its members, the judgment of such tribunal is, within its legitimate sphere, binding and conclusive upon the civil courts, and that such judgment must be followed by the civil courts in the determination of such property rights as the civil courts may be called upon to adjudicate." 245 Ill. 74, at 95.

In our opinion the controlling principle to be garnered

from the holdings of the cited United States Supreme Court cases and from this court's own holding in *First Presbyterian Church v. First Cumberland Presbyterian Church* is that where a local church is but a subordinate member of a superior general church organization, and has directly or impliedly consented to its form of government, that church is ordinarily bound by the decisions of the ecclesiastical judicatories. In these circumstances, the civil courts cannot, in the process of resolving property disputes between the local and the general church, independently determine questions properly within the sphere of ecclesiastical bodies.

Accordingly, the decision of the appellate court is reversed, and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE GOLDENHERSH, dissenting:

I dissent. In reaching the result achieved in its opinion the majority has disregarded sound legal principles established by the earlier decisions of this court, which legal principles were evolved after careful consideration over a substantial period of time and deserve better than the cavalier treatment to which the majority opinion subjects them.

The first controversy over property of a hierarchical-type church to reach this court involved a schism in a Presbyterian congregation and resulted in three opinions being written. (*Ferraria v. Vasconcelles*, 23 Ill. 403; *Vasconcellos v. Ferraria*, 27 Ill. 237; *Ferraria v. Vasconcellos*, 31 Ill. 25.) In 1851 the parties to that action left the island of Madeira where they were members of the Free Portuguese Church under the jurisdiction of the Free Presbyterian Church of Scotland, came to Jacksonville, Illinois, and there formed an unincorporated religious body under the name of the Free Portuguese Church. Prior

to leaving Madeira they had received the proper certificate of dismissal from the Free Church Presbytery of Glasgow, which had required that they unite with the Presbyterian Church of the United States. In 1852 they purchased a lot, took title in the name of individual members of the church as trustees, and erected a church building. In 1856, with the unanimous consent of the members, they presented their letter of dismissal from the Presbytery of Glasgow and applied for and were received in membership in the Presbytery of Sangamon. In 1858 a schism occurred in the local church as to whether the members would be re-baptized. At a meeting of the members, 105 voted to withdraw from the Sangamon Presbytery and 101 voted against withdrawal. The majority took possession of the church building, the minority filed an action for peaceable possession, and the trial court dismissed the action.

In its first opinion the court applied an implied-trust theory and held that the minority, who had not withdrawn from the Sangamon Presbytery, were the owners of the property. The court said: "The object of the donations of money, the purchase of the property and the erection of the church edifice, was to afford a place of worship according to the usages and principles of the body as then organized, and not according to the usages of some other body." (23 Ill. 403, 409-410.) The case was remanded for further proceedings, and in the second opinion the court stated that if the local congregation, according to the constitution, government and usages of the Presbyterian Church of the United States of America could withdraw from the presbytery without its consent, then the majority vote of the congregation made it independent of the Sangamon Presbytery. "The evidence in the record as it now appears, seems to establish this fact, and if so, the action of the minority was irregular and unwarranted, and by it they acquired no rights." (27 Ill. 237, 239.) The cause was remanded for further evidence on the right of a local congregation to withdraw from the presbytery without its consent.

In its third opinion the court ordered the partition of the property, stating: "*** whatever may be the ecclesiastical right of a church, or a portion of a church, to sever its connection with a particular presbytery, with or without its consent, it does not follow, that the majority in so acting, become entitled to the property of the church, to the exclusion of the minority. *** It may with truth be said, that as the majority did not forfeit its right to the property by withdrawing from, so neither did the minority by adhering to, the presbytery. *** The proceeds of the property ought, therefore, to be divided between them, in the proportion which the seceding and adhering members of that congregation bear to each other in point of numbers." (31 Ill. 25, 53.) The partition theory was again applied in *Niccols v. Rugg,* 47 Ill. 47, also involving a schism in a Presbyterian church, in which the court specifically referred to and followed *Ferraria v. Vasconcelles.*

In *Calkins v. Cheney,* 92 Ill. 463, upon which the appellate court principally relied, the plaintiffs contended that under the doctrine of *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 20 L. Ed. 666, or *Ferraria v. Vasconcelles,* 23 Ill. 403, in which the implied-trust doctrine was applied to a hierarchical church, they, as the adherents to the tenets of the Protestant Episcopal faith, were entitled to enjoin the defendant from further officiating in the church or occupying the premises. The court did not discuss *Watson v. Jones,* explicitly refused to find an implied trust, and, after discussing various sections of the religious-corporation statute, stated:

"From these references to the statute, it is clear that the trustees of an incorporated religious society or association do not hold the property, in the absence of a declared, or at least clearly implied trust, for any church in general, nor for the benefit of any peculiar doctrines or tenets of faith and practice in religious matters, but solely for the society or congregation whose officers

they are; and that they are not, in the discharge of their duties, subject to the control of any ecclesiastical judicatory.

\* \* \*

The incorporated societies here contemplated are \*\*\* civil corporations to be controlled and managed under the general principles of law applicable to such corporations, as administered by the civil courts." 92 Ill. 463, 476, 477, 478.

In *Dubs v. Egli*, 167 Ill. 514, there was a dispute in the Bethany Church and Society of Highland Park over which of two factions had the right to use the church property. The basis of the controversy is set forth in *Schweiker v. Husser*, 146 Ill. 399. When the property in *Dubs* was purchased, the discipline of the hierarchical denomination provided that all conveyances of land for the erection of a house of worship should provide: "In trust to be occupied, used and maintained as a place of divine worship by the ministry and membership of the Evangelical Association of North America, with power to dispose of and convey the same, subject to the discipline, usages and ministerial appointment of such church or association, as from time to time authorized and declared by the general conference of said association and the annual conference in whose bounds the said premises are situated." (167 Ill. 514, 518.) The members of the congregation wanted to retain control of the property and took title in three members as trustees of Bethany Church of Highland Park without any express declaration of trust. The congregation was incorporated as a religious corporation. The court said: "This case is thus clearly brought within the doctrine laid down by this court in the case of *Calkins v. Cheney*, 92 Ill. 463. It was there held, that property, purchased and conveyed under similar circumstances to those existing here, belongs to the society or congregation in its corporate capacity, not in trust for the benefit of the church at large as a religious denomination, but independent of it, and not subject to the control of any ecclesiastical judicatory." 167 Ill. 514, at 519.

In *Illinois Classis of the Reformed Church v. Holben,* 286 Ill. 473, two congregations of the Reformed Church in the United States had withdrawn from that denomination and become members of the Presbyterian Church of the United States of America. These congregations, located at Mt. Zion and Stonington, had comprised the Mt. Zion charge which was under the Illinois Classis of the Reformed Church in the United States. The Mt. Zion congregation took title to the Mt. Zion church property in named members of the congregation as trustees of the Mt. Zion Reformed Church and the Mt. Zion Cemetery Association. The Stonington congregation took title to the Stonington church property in named members of the congregation as trustees for the Mt. Zion charge of the Reformed Church. Neither of the local congregations was incorporated.

Later each congregation met and voted to have its respective consistory seek a letter of dismissal from the Illinois Classis in order that they might join the Springfield Presbytery. The Illinois Classis determined that it had no authority to grant letters of dismissal. The trustees of the two congregations then conveyed their property to a straw party who conveyed the property, respectively, to the trustees of the Mt. Zion Presbyterian Church and the trustees of the First Presbyterian Church at Stonington. The Illinois Classis then filed an action to quiet title against the trustees of the two congregations. It alleged that the attempt to withdraw from the Reformed Church and join the Presbyterian Church was contrary to the constitution and laws of the Reformed Church and constituted a dissolution of the local congregations, and that uder the constitution and laws of the Reformed Church, when a congregation is dissolved, its property becomes vested in the general body of the church.

Citing *Calkins v. Cheney,* the court in *Illinois Classis* stated: "The deeds contain no express declaration of trust for the benefit of the general body of any church denomination or for the teaching or practice of any

particular religious principles or doctrines or faith in religious matters. Such deeds are solely fo; the benefit of the congregations whose trustees are named as the grantees, and the right to the possession, control, and use of the property is vested solely in them. *** It is immaterial whether the grantees were incorporated or not." (286 Ill. 473, at 476-7.) In so holding, the court applied a formal-title doctrine rather than the civil-corporation doctrine applied in *Calkins v. Cheney* and *Dubs v. Egli*. The formal-title doctrine was again applied in *Glader v. Schwinge*, 336 Ill. 551.

The majority's reliance upon *Gonzales v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 74 L. Ed. 131, 50 S. Ct. 5, and *First Presbyterian Church v. First Cumberland Presbyterian Church*, 245 Ill. 74, is misplaced. In *Gonzales* the question presented was whether the petitioner was legally entitled to a collative chaplaincy in the Roman Catholic Archdiocese of Manila. The Supreme Court held that the determination of the petitioner's fitness for the assignment was a canonical act and the property rights involved were an incident of the office of chaplain. It is clear from the opinion that had the issue presented required interpretation of the terms of the trust, legal principles, and not canon law, would have governed.

In *First Presbyterian* the court was not called upon to decide a property question. That case reached the court in the posture of the opposing parties contending, on the one hand, that the reunion of the Presbyterian Church and the Cumberland Presbyterian Church effected by their national assemblies was valid, and on the other that it was invalid. Involved in the case was the property of the Cumberland Presbyterian Church in Lincoln. The court said "*** the determination of the question where the title to said church property now rests will necessarily involve a decision of the question whether the reunion of the Cumberland church with the Presbyterian church, as

declared by the general assemblies of the two churches in 1906, was valid and binding upon both churches and the members of the said churches and their church judicatories, or whether said reunion was invalid and void." (245 Ill. 74, 81.) "*** the question whether the reunion between the Cumberland church and the Presbyterian church was a valid reunion was a question for the general assemblies of the two churches to decide, sitting as the highest ecclesiastical judicatories of those churches, and that the general assembly of the Cumberland church, having held the reunion valid and binding upon the Cumberland church, its judgment is binding upon this court ***." 245 Ill. 74, 119-20.

This court has stated, explicitly and clearly, the distinction between a controversy which presents a question to be determined under ecclesiastical law and one to be decided under principles of civil law.

In *Marie Methodist Episcopal Church v. Trinity Methodist Episcopal Church,* 253 Ill. 21, 28, plaintiffs sought conveyance of certain property, contending, *inter alia,* that the general conference of the Methodist Church had decided the issue contrary to an earlier decision of the court (205 Ill. 601) and that the decision of the general conference was binding on the court and the parties. In rejecting the contention the court said, "The judicial power and the authority to adjudicate upon civil and property rights is vested in the courts and is not committed to ecclesiastical tribunals. The courts, however, accept the decisions of the highest tribunals of churches upon questions of faith and doctrine, and where the ownership of property is dependent upon the decision of such a question they will follow the construction of the ecclesiastical tribunal and adjudge the title to the property accordingly. *** The general conference did not determine an ecclesiastical question but decided upon the property rights of the parties to this litigation, and we cannot admit

the authority of the general conference to determine such rights."

The majority has strained to read into this record some implied submission to hierarchical control which would subject the property to the plaintiffs' control, but recitation of past conduct is of no significance. There is no question here that the congregation, on church matters, subjected itself to hierarchical control, but strain as it might the majority cannot glean from this record the facts necessary to remove this case from the rule of civil law. If the plaintiffs, in addition to the hierarchical control exercised over ecclesiastical matters, desired to control church property, a simple provision in the defendant church's bylaws or a reversionary clause in the deed by means of which the property was conveyed would have accomplished that result. It did not, however, pursue either course, and this case falls squarely under the doctrine of *Calkins v. Cheney*.

As the citations in this dissent demonstrate, our predecessors on this court, after careful consideration, have developed and applied the corporate-title doctrine of *Calkins v. Cheney* and the formal-title doctrine of *Illinois Classis v. Holben*. These are "sound legal principles of law developed for use in all property disputes" to which the Supreme Court referred in *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 21 L. Ed. 2d 658, 665, 89 S. Ct. 601, 606. If there are valid reasons for departing from long-established and clearly enunciated precedents, and none are reflected by either this record or the opinion of the majority, then they should be forthrightly overruled and not circumvented by means of nonexistent distinctions.